UNITED STATES DISTRICT COURT

**EASTERN DISTRICT OF WISCONSIN**

UNITED STATES OF AMERICA

    V.

                                     CRIMINAL COMPLAINT

JOHN LEE, A.K.A Keng Lee
(d.o.b. xx/xx/93)

                              CASE NUMBER: **18-M-** 720

       I, Jeremiah Winscher, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.   On or about June 20, 2018, in the State and Eastern District of Wisconsin, John Lee and others did as follows: knowingly conspire to distribute and possess with the intent to distribute methamphetamine in an amount exceeding 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846.

I further state that I am a Task Force Officer with the U.S. Drug Enforcement Administration, and this complaint is based on the following facts:

Please see the attached affidavit.

Continued on the attached sheet and made a part hereof:     X   Yes        No

                                   _____

                                   Signature of Complainant
                                   Jeremiah Winscher

Sworn to before me and subscribed in my presence,

_____               at Green Bay, Wisconsin
Date   Oct 9, 2018

The Honorable William C. Griesbach
United States District Court Judge            _____
**Name & Title of Judicial Officer**           Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH AND ARREST WARRANT

I, Jeremiah Winscher, being first duly sworn on oath, hereby depose and say:

## I.    EXPERIENCE

1.    I am currently employed as a Special Agent with the Wisconsin Department of Justice – Division of Criminal Investigation specializing in narcotics investigations, and have been so employed for approximately 7 years.   I am currently assigned to the Drug Enforcement Administration – Green Bay Resident Office and am a Federally Sworn Task Force Officer; having been assigned as such since early 2018, to investigate violations of Title 21 of the USC. Prior to that time period, I was employed as a Trooper with the Wisconsin State Patrol for approximately 5 years. I have had occasion to investigate violations of federal controlled substances laws, firearms laws and money laundering laws (Title 21, United States Code, §§ 841(a)(1), 846, Title 18, United States Code, §§ 922, and 924 and Title 18, United States Code, §§ 1956 and 1957) and other related offenses.

2.    As part of my employment, I have received specialized training in investigating federal narcotics violations, including, but not limited to, training in drug identification, use of informants, search warrant procedures and investigative techniques used in the investigation of individuals and organizations involved in the illegal manufacture and sale of controlled substances. During the course of my employment, I have participated in excess of at least fifty investigations involving the distribution of controlled substances leading to the arrest of in excess of fifty individuals for violations of federal and/or state controlled substance violations. I have participated in the execution of over fifty search warrants in the capacity of affiant and/or participant. These warrants involved the search of locations ranging from residences of targets, their associates and relatives, stash houses (houses used as drug/money storage locations), storage facilities, cell phones, electronically stored data and other

1

venues which store evidence. Evidence searched for, and recovered, in these locations have included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, firearms, electronically stored evidence and various assets that were purchased with the proceeds of drug trafficking.

3.      During the course of my employment, I have had numerous discussions with other experienced law enforcement officers, and have conducted and been present at numerous interviews of self-admitted narcotics traffickers and cooperating defendants concerning the manner in which drug traffickers and money launderers operate. In the course of my employment and experience, I have also become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Among these techniques are the use, occasionally, of multiple locations at which to conduct narcotics related activities, and keep records and narcotics, hidden compartments or hiding places in vehicles for narcotics and drug proceeds, the use of associates and workers to further their criminal enterprise. Additionally, I know that those engaged in drug trafficking commonly store documents for long periods of time including ledgers, receipts, travel documents, storage unit agreements, and other evidence at their place of residency. I also know those engaged in drug trafficking commonly change phone numbers, and phones, to deter law enforcement detection, however based on my training and experience, I know that these old devices are frequently stored and kept for longer periods of time.

## II.    LOCATIONS FOR WHICH SEARCH WARRANT IS SOUGHT AND INDIVIDUALS SUBJECT TO ARREST WARRANT.

4.      This affidavit is submitted in support of applications for a search warrant to search the residence associated with members of the targeted drug trafficking organization. This location is more particularly described as follows:

2

| Address | Description | Association |
|---|---|---|
| 1238 Geele Ave Apartment 6 Sheboygan, WI 53083 | a two story, multi-unit apartment complex positioned to the northeast of Geele Ave and 13th Ave in the City of Sheboygan, State of Wisconsin, Eastern District of Wisconsin, constructed of red brick with entry doors on the NE, NW, SE, SW center of the building facing Geele Ave, consisting of three floors of occupancy (1st, 2nd and lower level floors) with secure exterior entry doors and private apartment entry doors. Apartment 6 is located on the lower level facing south towards Geele Ave near the SouthWest corner of the building. There is the number "6" affixed to the door (diagram attached). The address has the numbers "1238" affixed to a monument sign near the intersection of 13th Ave and Geele Ave on the premise. Apartment 6 also has an associated storage locker, unit 14 on premise. | Premises of John LEE |

5.     As detailed below, there is probable cause to believe that located at this residence, storage facilities and vehicles associated with this residence, and on the named individuals are items that constitute evidence of the commission of drug offenses, contraband, and fruits of criminal activity in the form of drug proceeds including violations of 21 U.S.C. §§ 841 and 846.

6.     In addition, there is probable cause to believe that John LEE, a.k.a. Keng Lee DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992 have engaged in criminal activity, including, inter alia, violations of the controlled substances act, 21 U.S.C. §§ 841, 846 and 856. Further, there is probable cause to believe that John LEE DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992

3

have also engaged in controlled substance violations. Accordingly, this affidavit supports the issuance of arrest warrants for both individuals.

## III.  FACTUAL BASIS ESTABLISHING PROBABLE CAUSE

Based on my training, experience, and my participation in drug trafficking investigations and associated financial investigations involving large amounts of marijuana, methamphetamine and/or other controlled substances, I know and have observed:

a. that people involved in drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to launder the proceeds; such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control;

b. that drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

c. that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d. that drug traffickers must maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e. that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

4

f.    that it is common for drug dealers to secrete contraband, controlled substances, proceeds of drug sales and records of drug transactions, asset purchases and other items noted in the Attachment to this warrant in secure locations within their residences, storage lockers and/or garages associated with their residences, businesses, vehicles and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

g.    that in order to accomplish this concealment, drug traffickers frequently build stash places within their residences or business; there are a number of publications available instructing where and how to build stash places; copies of these types of publications have been found in the residences of drug traffickers;

h.    that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers; these items are maintained by the drug traffickers within their residences, businesses or other locations over which they maintain dominion and control;

i.    that drug traffickers often utilize electronic equipment such as computers and cellular telephones to generate, transfer, count, record and/or store the information described in items a, c, d, e, g and h above;

j.    that when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities; to accomplish these goals, drug traffickers often utilize domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of cash;

k.    that the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money);

l.    that it is common for drug dealers to physically handle and count the street money after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the street money; law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences, businesses, and other locations controlled by drug

5

traffickers;

m.     that it is common for drug dealers to separate their street money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

n.     that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

o.     that the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

p.     that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q.     that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the source of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other locations under the dominion and control of drug traffickers;

r.     that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephone memory, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s.     that drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product; these traffickers usually maintain these photographs in their possession;

t.     that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u.     that drug traffickers commonly have in their possession, that is on their person,

6

at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug traffickers property. Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records and United States currency;

v.    that the techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of counter-surveillance, multiple locations at which to conduct drug related activities and to keep records and drug, hidden compartments in vehicles used to hide drug and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and workers to further their criminal enterprise;

w.    that drug traffickers commonly front (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences;

x.    that drug traffickers commonly use telephones whether a land line (home telephone) or cellular telephones to arrange for drug purchases or deliveries. It is also common for drug traffickers to maintain and use several cellular telephones at the same. Typically, when a drug trafficker switches to a new cellular telephone he/she will keep that phone and not destroy it. Among other reasons, the Drug trafficker will do so to maintain the list of drug related contacts that have been accumulated. gso;

y.    that drug traffickers usually keep paraphernalia for packaging, cutting, cooking, weighing and distribution of controlled substances in their residences and in a stash house locations, specifically locations used by the conspiracy to conduct these activities;

z.    that drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them. Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and taxi cab receipts.

7.    Unless otherwise noted, the following information was obtained by your affiant, other special agents and officers of various local drug units, third-party witness interviews, and/or from other law enforcement officers who conducted additional investigation into the subject matter of this criminal enterprise, all of whom I believe to be truthful and reliable. To the extent that the information

was obtained from confidential informants, their reliability is set forth separately herein.

## IV.  BACKGROUND OF AND BASIS FOR THE INVESTIGATION

8.     This affidavit was prepared in connection to the ongoing drug investigation involving John LEE DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992. Source information, controlled drug purchases by cooperative witnesses, court orders, search warrants, interviews of cooperating witnesses, surveillance, and law enforcement records have been utilized in this investigation.

9.     Your affiant has spoken to a confidential source of information pursuant to this investigation that has provided information on the drug trafficking patterns of members of the organization operated by John LEE DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992.

10.     Confidential source number one (CS1) has stated that CS1 is familiar with Subject 1 (SUB1) and Subject 2 (SUB2) and knows that they traveled out of state between June 15, 2018, and June 20, 2018, for purposes of obtaining a large amount of illegal drugs. SUB1 was later interviewed and admitted that he associated with John LEE DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992, over an extended period of time, for the purposes of illegal drug trafficking.

11.     On or about June 16, 2018, the Wisconsin State Patrol – District 3 Fond du Lac Post, received a tip from CS1. CS1 stated two parties were traveling from the Eastern District of Wisconsin to California in order to procure large amounts of illegal controlled substances. CS1 identified by name the two individuals alleged to be making the trip, herein referred to as SUB1 and SUB2. CS1 stated SUB1 and SUB2 were using a particular vehicle and would be picking up marijuana and also cocaine, methamphetamine or heroin. CS1 identified the license plate on the suspect trip vehicle as well as SUB2's cellular telephone number. CS1 stated SUB1 and SUB2 departed Wisconsin on June 15, 2018. On June 17, 2018, I spoke with CS1 who stated SUB1 and SUB2 were planning on leaving California to return to Wisconsin the following day. I was able to corroborate the alleged trip information

8

pertaining to SUB1 and SUB2 through various investigative means and law enforcement was able to locate the suspect trip vehicle entering Wisconsin during the early morning hours of June 20, 2018. This vehicle was stopped by a Wisconsin State Patrol Trooper in Sheboygan County, in the Eastern District of Wisconsin. A subsequent search of the vehicle revealed personal use amounts of marijuana as well as a safe in the rear cargo area which contained approximately 26 pounds of suspected methamphetamine- an amount very clearly possessed with the intent to distribute. The suspected methamphetamine field test positive for the presence of methamphetamine. Law enforcement noted that at the time of the traffic stop, SUB1 was holding a cellular phone which was later determined to be the cellular phone of SUB2. Both SUB1 and SUB2 were transported to a law enforcement facility for follow up interviews.

## V.   INFORMATION OBTAINED THROUGH INTERVIEW

12.     On June 20, 2018, TFO Brian Messerschmidt interviewed SUB2. SUB2 stated SUB2 drove from the Eastern District of Wisconsin to Fresno, California with SUB1 to pick up a friend. SUB2 drove the vehicle and SUB1 was the passenger during the trip, in which they were to meet with a "Keng LEE" in Fresno, California. SUB2 observed a transaction occur at the Quality Inn hotel with the reported "Keng LEE" and SUB1. SUB2 stated they stayed in room 139 at the Quality Inn hotel. SUB2 stated there was a safe in the rear of their vehicle upon departure from Wisconsin and denied ownership or knowledge of the contents of the safe. SUB2 stated SUB1 was using SUB2's cellular phone during the duration of the trip from Wisconsin to California and back to Wisconsin.   SUB2 stated SUB1 was communicating with "Keng LEE" (using a 226 number) on SUB2's cellular phone via both text message and facebook messenger. SUB2 provided consent to investigators to search SUB2's cellular phone which had been seized by law enforcement. SUB2 stated SUB1 met with "Keng LEE" in Fresno, CA, and had flown to Fresno to conduct the transaction and then flew back to

9

Wisconsin on June 17, 2018, at approximately 4:30 PM. SUB2 stated upon departing Fresno, California, to return to Wisconsin, SUB1 began to disclose certain details to SUB2 including the identity of SUB1's sources of supply, those being "Keng" "Meng" and "Kong". SUB2 stated either "Keng" or "Kong" works at American Orthodontics and all reside in Sheboygan, Wisconsin. SUB2 stated upon returning to the Sheboygan area SUB2 and SUB1 were supposed to meet with one of them at the Walmart and SUB1 was in phone contact with Keng or Kong LEE about this prior to being stopped by law enforcement.

13. On 06/20/2018, I interviewed SUB1. SUB1 stated they (meaning SUB1 and SUB2) went to California to pick up a friend. SUB1 stated they met with their friend at the Quality Inn in Fresno, California, and SUB1 went on the trip solely for recreational marijuana usage. SUB1 and SUB2 departed the Eastern District of Wisconsin on June 15, 2018, traveled to California and departed to return to Wisconsin on June 18, 2018. SUB1 stated upon arriving in California SUB1 and SUB2 met with an Asian male named "Keng LEE". SUB1 stated SUB2 was picking up drugs for "Keng LEE" and would be compensated for doing so. SUB1 reported "Keng LEE" had a brother named "Kong LEE" who SUB1 used to buy marijuana from, which is how SUB1 knew "Keng LEE". SUB1 reported that at some point SUB1 saw a safe in the rear of their vehicle but denied ownership of the safe stating there should be methamphetamine inside of it. SUB1 stated the only phone used on the trip out to California was that of SUB2. SUB1 reported "Keng LEE" called to check on SUB1 and SUB2 on their return from California. Lee would pay people to transport drugs for him. SUB1 stated "Keng LEE" flew back to Wisconsin on June 17, 2018, and lives on the north side of Sheboygan, Wisconsin. SUB1 requested at attorney to be present for the interview at this point and the interview was terminated.

14. On June 28, 2018, I and TFO Messerschmidt conducted a proffered interview with SUB1 in the presence of SUB1's assigned defense counsel. SUB1 first obtained methamphetamine from a male

10

identified by SUB1 as Kennedy LEE. SUB1 stated Kennedy LEE was related to "Keng LEE" and "Kong LEE. SUB1 stated Kennedy LEE was arrested in approximately 2016 and SUB1 was also incarcerated with Kennedy LEE at the Sheboygan County Jail. SUB1 stated Kennedy LEE told SUB1 he would connect him with another party to supply SUB1 with illegal controlled substances such as methamphetamine and marijuana. SUB1 was released from jail in approximately April of 2017 and in approximately August of 2017, "Keng LEE" told him he had ½ pounds of marijuana for sale. SUB1 met "Keng LEE" and discussed working with him to sell methamphetamine for "Keng LEE". SUB1 reporting having approximately 10 customers at first which then developed into 15-20 customers, most of whom were SUB1's friends. SUB1 reported receiving controlled substances from Keng Lee to include ½ pound of marijuana per week and 1 ounce of methamphetamine per week when SUB1 had 10 customers and upwards of 2 ounces of methamphetamine per week when SUB1 had 15-20 customers. "Keng LEE" charged SUB1 $175 for 3.5 grams of methamphetamine which was always fronted to SUB1. SUB1 stated Keng Lee charged him $1000 for one ounce of methamphetamine but the price eventually dropped to $900 per ounce. SUB1 stated he was told by Keng Lee that if the trip between 06/15/2018 and 06/20/2018 was successful ounces of methamphetamine would cost $750. SUB1 also reported "Keng LEE" assisted with a family marijuana grow operation in California and "Keng LEE's" brother, Kong LEE, would supply SUB1 while "Keng LEE" was gone. SUB1 further stated "Kong Meng LEE" was supplying SUB1 with ounces of methamphetamine for $800 in approximately October of 2017 and SUB1 would get 1-1.5 ounces at a time from Kong Meng LEE. SUB1 stated "Keng LEE" was gone for about 2 weeks during this time and when he returned, SUB1 began to purchase methamphetamine from both "Keng LEE" and "Kong LEE".  SUB1 reported being arrested in approximately November of 2017 and remained in custody until March of 2018. SUB1 stated Kong Meng LEE drove a newer white Suburu WRX and worked at American Orthodontics in Sheboygan,

11

Wisconsin. SUB1 reported typically meeting with Kong LEE to purchase methamphetamine in the parking lot of American Orthodontics around 6:00 PM when Kong LEE was on a break. SUB1 believed "Keng LEE" was approximately 30 years of age and Kong LEE was approximately 32 years of age. SUB1 stated Keng Lee kept his money in cash while Kong Lee kept it in a bank. SUB1 stated "Keng LEE" had a child with a wife named "Diane" or "Deanna" and lived at the Washington School Apartments at 1238 Geele Ave, Sheboygan, Wisconsin. SUB1 reported "Keng LEE" drove a red colored Toyota and had a tattoo "family" on his hand with another tattoo of his father on his chest. SUB1 stated both "Keng LEE" and "Kong LEE" previously resided with their mother next to Champs bar near the intersection of 16th and Indiana in Sheboygan. SUB1 stated "Keng LEE" and "Kong LEE" refer to methamphetamine as "white". SUB1 stated "Keng LEE" obtained his meth from California and "Kong LEE" obtained his meth from Chicago, although both work together in the business locally. SUB1 stated, in reference to the 06/15/2018 through 06/20/2018 trip to California, that SUB1 was working off a $2500 drug debt owed to "Keng LEE" from prior occasions when he obtained methamphetamine without paying for it in advance. SUB1 stated "Keng LEE" approached SUB1 on 06/11/2018 or 06/12/2018 about traveling to California and when they met, "Keng LEE" provided SUB1 with meth to sell in order to have gas money for the trip. SUB1 stated this transaction occurred near the 12th and Geele Ave area in Sheboygan, which I know is in the general vicinity of 1238 Geele Ave. SUB1 added that "Keng LEE" had approximately 20 pounds of marijuana his vehicle at the time as well. SUB1 stated "Keng LEE" provided the safe combination when SUB1 and SUB2 were in the Nevada area so SUB1 could purchase gas and SUB1 observed approximately $10,000 of US Currency inside the safe. SUB1 reported "Keng LEE" told SUB1 that they were picking up approximately 3 pounds of methamphetamine. SUB1 stated upon arriving in Fresno, CA, "Keng LEE" retrieved the money from the safe and left for a short while returning to put a new safe inside SUB1 and SUB2's vehicle. SUB1 stated both "Keng LEE" and "Kong

12

LEE" are known to carry guns in their vehicles. SUB1 alleged to be receiving $6000 for the trip, which then became $4000 and a ¼ pound of marijuana. The parties ultimately settled on $2500 and a ¼ pound of marijuana for payment from "Keng LEE". SUB1 advised "Keng LEE" instructed SUB1 to go to Walmart in Sheboygan to turn the safe with the methamphetamine over to "Kong LEE". SUB1 advised that both "Keng LEE" and "Kong LEE" were providing instructions to SUB1.

15. On June 29, 2018, I conducted a follow up interview with SUB1. I presented a photo array to SUB1 to attempt to identify suspects in this investigation. SUB1 was unable to positively identify any of the parties in the photo array. SUB1 advised "Keng LEE" had a tattoo of his father's face on his chest, a tattoo "family" on his hand, a tattoo of a Koi Fish and knew his sister to live on the north side of Sheboygan. SUB1 stated "Keng LEEs" spouse's name was "Diane" with a last name of possibly "XIONG". SUB1 recalled viewing photographs of "Keng LEE" and "Diane" together on Facebook. SUB1 further advised that when meeting with "Keng LEE" prior to departing for California "Keng LEE" was driving a red Chevy pickup truck. SUB1 also stated "Keng LEE" had a stud piercing just above his chin. I located a Facebook profile "Vanessa Diane XIONG" which SUB1 identified as that of "Keng LEE's" spouse. In scrolling through the public profile on this Facebook page, I observed a photograph posted on June 17, 2018, of a male with a juvenile. SUB1 immediately identified this male as an image of "Keng LEE". SUB1 stated his male was the "Keng LEE" who SUB1 and SUB2 traveled to pick up methamphetamine for which was seized by law enforcement on June 20, 2018. The image identified was also consistent with the physical description provided by SUB1 of "Keng LEE". I conducted open source searches for "Vanessa XIONG" and located a 2013 paternity case which listed a "John LEE" born in July of 1993 as a father. Further open source searches revealed a John LEE born 07/14/1993 with an address near Champs Bar in Sheboygan having been stopped driving a red colored Toyota registered at 1020 Bell Ave in Sheboygan. This information is consistent with information provided by SUB1. I

13

viewed a DOT photo of John LEE 07/14/1993, and positively identified "Keng LEE" as John LEE 07/17/1993. Additionally, I was able to locate a white colored Suburu WRX parked in front of 1020 Bell Ave which was registered to Kong Meng LEE 05/10/1992. TFO Winscher knows Kong Meng LEE to work at American Orthodontics, again consistent with information provided by SUB1. John LEE listed an address with the WI DOT as 1238 Geele Ave, #6, in Sheboygan, which is the Washington School Apartments. Prior booking photographs of John LEE from Winnebago County detail a tattoo of a Koi Fish on his body.

16.    I believe that John LEE DOB: 07/14/1993, is the individual known to SUB1 as Keng Lee and that Kong Meng LEE DOB: 05/10/1992, is the individual known to SUB1 as Kong Lee.

## VI. RECORD ANALYSIS, WARRANTS and OTHER INVESTIGATIONS

17.    On June 26, 2018, TFO Daniel Yantes obtained a search warrant for SUB2's cellular telephone which was seized during the June 20, 2018 traffic stop. A search of the phone revealed it was previously logged into the Facebook account of SUB1 and shown to belong to SUB2. Geotagging on the phone showed data in Manitowoc County on 06/15/2018 and in southeastern California on 06/17/2018 with return trip data passing through Denver, CO, on 06/19/2018. A text message was received on the phone from 920-254-2560 reading Where you at * SUB1* this Kong. Text messages were also viewed beginning on 06/15/2018 from 920-226-9287 which is a number that had been identified as belonging to John LEE. These messages provided instructions from John LEE to SUB1 relating to the transport of the seized 26 pounds of methamphetamine. John LEE texted SUB1 the address for the Quality Inn in Fresno on 06/17/2018 and discussed SUB1 and SUB2 staying overnight at the hotel. Furthermore, Facebook conversations between SUB1 and John LEE (with a facebook profile of "Keng LEE") reveal John LEE and SUB1 discussing the impending trip to California on 06/14/2018. The conversations continue through 06/20/2018 and are directly related to John LEE providing instructions to SUB1 related

14

to the acquisition and future transport/deliver of the seized 26 pounds of methamphetamine. John LEE, via Facebook, repeatedly inquired of SUB1 as to their location and mentioned John LEE's upcoming flight. John LEE and SUB1 discussed compensation for making the trip and two particular messages sent by John LEE on 06/20/2018 at approximately 2:51 AM read "My bro will meet ul with u" and "Kong gonna bring u the qp and 4k". SUB1 asked John LEE "Shoukd i give him the. Safe" and John LEE replied "Yes".

18. I further observed messages between Kong Meng LEE (using Facebook profile "Tub Meng LEE") and SUB1 reveal that Kong Meng LEE was also involved in the trafficking of the seized 26 pounds of methamphetamine back to Wisconsin. Messages between Kong Meng LEE and SUB1 are observed beginning on 06/18/2018 and go through 06/20/2018. Messages sent from Kong Meng LEE indicate concern for any travel through Nebraska stating "Damn ya crazy Nebraska" and "That's the most traffic patrol". On 06/19/2018 SUB1 sends a message via Facebook to Kong Meng LEE reading "Wow kong" further identifying the user of "Tub Meng LEE" as Kong Meng LEE. Discussions during the early morning hours of 06/20/2018 include discussion of the safe to be provided to Kong Meng LEE as well as payment to be received by SUB1; Kong Meng LEE sent a message to SUB1 on 06/20/2018 at 2:29 AM reading "Imma give u 2k and a qp… cause I still o keng 5k left n I use ur 2k u o me pay him already well he use it". SUB1 requested to be compensated in "outdoor" (meaning outdoor grown marijuana) to which Kong Meng LEE responded "Them outdoor is at the bro house but his wife trippin" indicating marijuana may be stored at John LEE's house. At 5:12 AM SUB1 told Kong Meng LEE to go to Walmart in ten minutes which Kong Meng LEE replied "Okay" and "Here". I know that both Facebook profiles "Keng LEE" and "Tub Meng LEE" were either suspended or deleted shortly after SUB1 and SUB2 were arrested and the 26 pounds of meth seized.

19. On July 10, 2018, I applied for and received authorization for GPS warrants on John

15

LEE's red Chevy Truck and maroon Toyota Camry. The GPS units were installed on both vehicles. Generally speaking, the overnight stay activity for both vehicle tended to be in the parking lot of 1238 Geele Ave in Sheboygan as well as moderately near 1022 Bell Ave, Sheboygan. Surveillance showed John LEE operating both vehicles, which also match the description of the vehicle associated to John LEE provided by SUB1 during prior interviews. While installing the GPS devices, I observed the license plate formerly on Kong Meng LEE's white Suburu WRX was now on a black colored Honda CRV parked in front of 1022 Bell Ave, Sheboygan.

20.     On July 16, 2018, I applied for and received authorization for a search warrant to SUB1's Facebook page. I observed substantial historical conversations between Kong Meng LEE (on profile "Tub Meng LEE") and SUB1 that referenced quantities of methamphetamine as "white" and marijuana transactions. Conversations between SUB1 and John LEE (on profile "Keng LEE") also detail travel plans concerning the trip to California over 06/15/2018 through 06/20/2018.

21.     I know that search warrants were also obtained for the facebook profiles of "Keng LEE", "Tub Meng LEE" and "Hmong LEE" (which had been identified as John LEE's newly established profile after the 06/20/2018 seizure. I discovered that the profile for "Tub ng LEE" had been completely deleted. Some data was recovered from profile "Keng LEE" which revealed associated email address of leekeng920@hotmail.com and johnkenglee@facebook.com. A vanity name of "johnkenglee" was also shown. A mobile device registration was shown on 06/19/2018 which placed the login at 1238 Geele Ave in Sheboygan. The profile "Hmong LEE" was registered on IP address 71.90.51.49 with an email kenglee920@gmail.com and a vanity name of "klee920". I also noted that publically viewable post on the Facebook page of Vanessa Diane XIONG (John LEE's spouse) showed postings on John LEE's birthday of 07/14/1993 reading "Happy birthday Keng!" and "Happy birthday John".

16

22.     On August 2, 2018, I drafted and received authorization for a search warrant for cellular number 920-226-9287, which is the number used by John LEE in June of 2018 to communicate with SUB1 reference the trip to California. A search warrant was also served for the cellular number of 920-912-6991 which was John LEE's newly established number. Geographical data provided by the cellular carrier for 920-912-6991 showed consistent overnight stays for John LEE, the user of the cellular phone, to be in the vicinity of 1238 Geele Ave, Sheboygan. Additionally, tower data recovered from the cellular carrier for 920-226-9287 showed routine overnight stays near John LEE's residence at 1238 Geele Ave in Sheboygan and furthermore, showed a June 16, 2018, trip to Milwaukee, followed to a trip to Phoenix and then Fresno, California, and ultimately back to Wisconsin the following day. This is consistent with information that John LEE flew to California to conduct the meth transaction with SUB1 over that time period. Additionally, tower data recovered from the cellular carrier for 920-226-9287 showed the phone in the area of a traffic stop whereas John LEE was identified by the State Patrol on May 7, 2018, in Racine County. This data showed John LEE as the user of 920-226-9287, which is the same number SUB1 communicated with during the trip to California.

23. I am aware that records from American Airlines corroborated John LEE DOB 07/14/1993 as a flight passenger departing Milwaukee on 06/16/2018, connecting to Phoenix with a destination of Fresno, California. John LEE departed Fresno, California, on 06/17/2018 and returned to Wisconsin. Additionally, American Airlines documents suggest Kong Meng LEE made and paid for the flight reservations for John LEE. A phone number was listed on the reservation as 920-889-4539, which is a number subscribed to by Kong Meng LEE.

24.     I also obtained records from Verizon Wireless for information relating to IP address 174.238.145.72 by TFO Winscher. This IP Address was observed as a login IP for the Facebook profile

17

"Keng LEE" (known to be John LEE), specifically on 06/16/2018 when John LEE flew to California. Verizon reported this IP address as a "natting router" IP meaning it could be used by multiple persons, however I noted the cellular number for John LEE of 920-226-9287 was a number that registered on that IP indicating John LEE was using the IP via his cellular phone to log into Facebook profile "Keng LEE".

25. I also obtained records from Charter Communications for information relating to IP address 71.90.51.49 and 71.90.55.50, which were both observed as heavily used login IP Addresses for Facebook profile "Keng LEE" (known to be John LEE). IP address 71.90.51.49 was registered to John LEE at 1238 Geele Ave, Apartment 6, Sheboygan, Wisconsin, with email addresses of leekeng920@hotmail.com, vanessa.xiong@yahoo.com and vanessa_d_xiong@charter.net. IP address 71.90.55.50 was registered to Udom XIONG at 1020 Bell Ave, Sheboygan, Wisconsin, which is a known associate address for John LEE as well as Kong Meng LEE along with 1022 Bell Ave in Sheboygan.

26. In September of 2018, I reviewed data from a prior law enforcement seized phone of SUB1 which had been taken into evidence, and searched by authorities in Sheboygan, Wisconsin, related to the arrest of SUB1 prior to June of 2018. I observed contacts saved as "Keng" as well as "Kong". "Keng" was saved with cellular number 920-889-7241 and "Kong" with cellular number 920-889-4539. I had previously filed subpoena's for both of the said numbers which revealed the subscriber of 920-889-7241 as "Smiley Lopez" at 1151 Indiana Ave in Sheboygan (a former address of John LEE which was listed on LEE's driver's license as of 04/28/2017, and updated to 1238 Geele Ave, apartment 6, in May of 2018) and the subscriber of 920-889-4539 as Kong LEE at 1022 Bell Ave in Sheboygan. Additionally, I observed a large quantity of drug related text messages stored on SUB1's phone; some of which were directly to "Keng" (who has been identified as John LEE) and "Kong" (Kong Meng LEE). In messages between SUB1 and "Keng" is one message sent to SUB1 by "Keng" on 05/15/2018 reading "Yo ***,this my new number". SUB1 sent "Keng" a reply reading "Keng" to which Keng (John LEE) replied "Yes".

18

Reviewing the messages between "Keng" and SUB1, it was clear "Keng" was supplying SUB1 with controlled substances, specifically "white" (meth). In messages between SUB1 and "Kong" is one message sent to "Kong" by SUB1 on 04/14/2018 reading "This *** my new number" which is replied to by a message from "Kong" reading "Kool". Reviewing the messages between "Kong" and SUB1, I believe it was clear "Kong" was supplying SUB1 with controlled substances, specifically marijuana and "white" (meth).

27.     On September 11, 2018, US Postal Inspector Metke informed me that two parties received mail at 1022 Bell Ave, including Kong LEE and Sae WANG. Inspector Metke also advised a Vanessa XIONG and a party with the last name LEE received mail at 1238 Geele Ave, Apartment 6. It was noted that Vanessa XIONG had recently filed a change of address form from 1022 Bell Ave to 1238 Geele Ave, Apt 6.

## VII. SURVEILLANCE OBSERVATIONS

28.     On July 2, 2018, I observed John LEE's red Chevy Pickup truck arrive at 1238 Geele Ave in Sheboygan. I was able to identify the driver as John LEE as John LEE entered the apartment building.   On this same date, I observed Kong Meng LEE's white Suburu parked at American Orthodonics consistent with information provided by SUB1 that Kong Meng LEE works there.   On this same date, I observed John LEE's maroon Toyota depart the address of 1238 Geele Ave and travel to the area of 1020 and 1022 Bell Ave whereas John LEE was observed to exit the vehicle and approach the 1022 Bell Ave address door entrance.

29.     On July 12, 2018, I, along with other investigators, conducted surveillance on John LEE driving his maroon Toyota accompanied by Vanessa Diane XIONG. After various stops around Sheboygan the maroon Toyota was observed parking at 1238 Geele Ave. John LEE, Vanessa XIONG and a juvenile exited the Toyota and were observed to enter the address at 1238 Geele Ave.

19

30. On July 23, 2018 and subsequent days, I conducted surveillance on John LEE operating his red Chevy pickup truck and through electronic surveillance means observed the red Chevy Silverado bearing WI license plate NN6344 was located at, or near, Deland Park at the intersection of Broughton Dr and Washington Ct in Sheboygan, Wisconsin. Throughout this surveillance, LEE was observed meeting with occupants from a vehicle with an Alabama license plate, and driving in a pattern not consistent with the general motoring public. LEE ultimately was observed at or near 1022 Bell Ave via electronic surveillance in Sheboygan when surveillance was terminated.

31. On August 21, 2018, I conducted surveillance with other officers in reference to this case file. I observed a dark colored SUV bearing WI plate 803XBA parked in the lot of American Orthodontics. This is the known work location of Kong Meng LEE. An Asian male was seated in the vehicle, however, that male party (who had similar physical characteristics to that of Kong LEE) exited the vehicle and re-entered the business location. TFO Messerschmidt observed John LEE exit the address of 1238 Geele Ave and enter a maroon Camry bearing WI plate 375UAA. John LEE departed, and was followed by law enforcement and ultimately observed to arrive back at 1238 Geele Ave where TFO Messerschmidt observed both John LEE enter the building through the NorthWest doorway after smoking what appeared to be a marijuana bong and then carrying it into the building. Surveillance was terminated shortly thereafter. I noted John LEE was making a number of phone contact with "Keng Lee" at 920-331-1854, which appeared to be accompanied by a short term trip to Kwik Trip located at 2033 North Ave in Sheboygan, utilizing the maroon Toyota Camry (per electronic surveillance).

32. On August 29, 2018, I traveled to the Kwik Trip on North Ave in Sheboygan and spoke with the manager. I requested surveillance video form 9:15PM to 10:15 PM from 08/21/2018. The manager provided me the requested video and I reviewed it noting at approximately 9:31PM a maroon colored passenger car comes into view on the north side of the parking lot. The vehicle appeared to

20

circle around the parking lot where it becomes stationary at the northern-most gas pump at approximately 9:32PM. I did not observe anyone exit the vehicle and the vehicle remained parked with headlights on. Video feeds from the east side of the building confirmed a license plate of 375UAA, which is known to be John LEE's maroon Toyota. At approximately 9:36 PM, I observed a light or tan colored passenger vehicle come into view entering the lot on the north side. This vehicle pulled up next to John LEE's Toyota for a brief moment and then performed a U-turn departing the lot followed by John LEE's Toyota at approximately 9:37 PM. No further observations were made.

33.     On October 8, 2018, I spoke to the property manager from 1238 Geele Ave (Washington School Apartments), in Sheboygan, Wisconsin. The property manager reported Apartment 6 was rented by Vanessa Diane XIONG and also occupied by John LEE along with a juvenile child. I noted apartment 6 at 1238 Geele Ave was located facing south, just east of the southeast entrance door, on the lower level towards the southeast corner of the building. Additionally, the property manager advised that the property at 1238 Geele Ave was equipped with a video surveillance system. I was shown video from 10/03/2018 at approximately 5:00 PM, which is a date and time reference previous information obtained through the examination of a cellular phone belonging to Kong Ly YANG as suspected to be when John LEE met with Kong Ly YANG and another male party related to illegal drug use. Specifically, a message is observed reading "Yea keng (John LEE) told me to stop by so he can smoke me up". The property manager supplied me with still images of surveillance video surrounding this transaction. On 10/03/2018, at approximately 4:57 PM, I observed a male exit apartment 6 carrying a garbage bag. At approximately 4:58 PM, I reviewed an image of a male I recognized as John LEE proceeding through the building and exiting the northwest exit door. LEE proceeded to the west side of the building and at approximately 4:59 PM is observed to enter the passenger seat of a white colored passenger car. At approximately 5:02 PM the white vehicle

21

is observed driving through the lot. Subsequently a dark green Honda Civic bearing license plate

578ZUA is observed to park in the lot (the known vehicle of Kong Ly YANG) to which a male

visually consistent with the identity of Kong Ly YANG is observed exiting from. This male party

approached the white passenger car on Geele Ave and then departed the area. At approximately 5:31

PM the white vehicle re-entered the parking lot and contained three individuals. On October 9, 2018,

the property manager advised me that storage unit 14 is associated with John Lee's Apartment 6.

### COOPERATIVE WITNESS RELIABILITY

34.     Your affiant believes the statements provided by CS1 are reliable because they have

been verified, in part, by law enforcement action in the form of surveillance, records examination and

derivative seizures.   Further, CS1 has agreed to testify in court against SUB1 and SUB2 and any

others involved in this investigation.

## VIII.   CONCLUSION

35.     Your affiant believes that this affidavit establishes probable cause that John LEE

DOB: 07/14/1993 and Kong Meng LEE DOB: 05/10/1992 have been involved in the distribution of

controlled substances in the Eastern District of Wisconsin and continue to do so at the present time.

36.     Your affiant further believes that this affidavit establishes probable cause that the

residence, vehicles, garages and storage lockers associated with the premise for which the search

warrant is sought has been and is continuing to be used to commit drug transactions, store money and

assets, and would likely be used to secrete financial records, notes, papers, other documents, firearms,

and the other items detailed in Attachment A, Items to Be Seized.   Your affiant knows from his

experience investigating drug cases that drug dealers, such as John LEE DOB: 07/14/1993 continue to

sell drugs over a long period of time until caught and are likely to keep their drugs and drug related

evidence including money and packaging materials at their residence, in this case 1238 Geele Ave,

22

Apartment 6, Sheboygan, WI (as well as storage locker 14).

37.     Based on the foregoing, there is probable cause to believe that located in residence and storage lockers described in paragraph 4 above, there is evidence of drug trafficking, evidence pertaining to the laundering of the proceeds from cocaine and/or marijuana trafficking, and fruits, instrumentalities and proceeds of drug trafficking, all of which is detailed more specifically in Attachment A, Items to be Seized.

TFO Jeremiah Winscher
Drug Enforcement Adminstration

Subscribed and sworn before me this _9th_ day
of October, 2018.

The Honorable William C. Griesbach
United States District Judge

23

## Attachment A, Items to be Seized

1.      Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular, marijuana;

2.      Papers, tickets, notes, receipts and other items relating to domestic and international travel;

3.      Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts and cashiers checks, bank checks, safe deposit box keys, money wrappers and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditures of money;

4.      Electronic equipment such as computers and cellular telephones, and other electronic or paper records used to record and/or store the information described in items 1-3 as well as 5-11 of this exhibit.   Additionally, computer software, tapes and discs, audio tapes and the contents therein, containing the information generated by the aforementioned electronic equipment;

5.      United States currency, including pre-recorded bills in the form of buy money, precious metals, jewelry and financial instruments, including stocks and bonds;

6.      Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled dangerous substances;

7.      Address and/or telephone books, and any papers reflecting names, addresses, telephone numbers, of co-conspirators, sources of supply, customers, financial institutions and other individuals or businesses with whom a financial relationship exists;

8.      Indicia of occupancy, residency, rental and/or ownership of the premises described

24

herein, including, but not limited to utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, and keys; and,

9. Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine-guns and other weapons and any records or receipts pertaining to firearms and ammunition.

10. Controlled Substances, including methamphetamine and marijuana, paraphernalia associated with the sale and production of controlled substances.

11. Safes, lock boxes, or other storage containers that could house the above-mentioned items to be seized.